**Howard T. WALKER, Plaintiff,**

v.

**WORLD TIRE CORPORATION, INC. and Robert Ross, Defendants.**

No. 75–253C(2).

United States District Court, E. D. Missouri, E. D.

June 25, 1976.

Susan Speigel, St. Louis, Mo., Helen Jones, Crestwood, Mo., Susan B. Stone and Michael J. Hoare, St. Louis, Mo., for plaintiff.

Jerome Kalishman, Clayton, Mo., for defendants.

## MEMORANDUM

REGAN, District Judge.

Alleging that defendants discriminated against him on the basis of his race, plaintiff sought both Title VII and Section 1981 relief.

Plaintiff, a black male, was employed by defendant World Tire Company, of which defendant Robert Ross is chief executive officer, from August 9, 1964, to August 2, 1971. World Tire Company is engaged in the distribution and sale of tires, chiefly on the wholesale level, and employs more than 15 persons. During the entire term of his employment, plaintiff was part of the warehouse collective bargaining unit covered by the collective bargaining agreement between World Tire Company and Teamsters Union Local 618. Plaintiff was originally classified as a TBA driver, a position within the warehouse department, and subsequently in April, 1969, at his request, he was reclassified as a warehouseman remaining in that classification until his termination on August 2, 1971 for "excessive absenteeism."

As a warehouseman, plaintiff spent part of his time loading, unloading and stacking tires, and spent other portions of his time handling tires returned by customers for price or replacement adjustment. In connection with these so-called "adjustment tires," plaintiff's work sometimes included the manual labor of moving and stacking, and sometimes included the non-manual

tasks of inspecting the tires and reducing the information to writing. All of his duties involving adjustment tires were performed in the warehouse area under the supervision of his brother (who had been promoted in 1968 to the supervisory position).

Within the general office area of the company there existed a non-union job which was filled by a person who was designated as a "tire adjuster." The tire adjuster (only one person at any one time held that job) spent a portion of his time at the warehouse where his duties consisted of the same non-manual tasks involving "adjustment tires" sometimes performed by plaintiff. However, most of the time of the "tire adjuster" was spent in the general offices, some of it in connection with "adjustment tires" and some of it in connection with tasks unrelated to adjustment tires.

The general office duties of the tire adjuster involving adjustment tires included discussions and negotiations with complaining customers and attempts to satisfy them, the preparation of paper work and input to computer and checking computer output, as well as dealing with the various factories to which defective tires were returned by the company. Other duties of the tire adjuster which did not involve adjustment tires included making over-the-counter sales.

It is apparent from the evidence that the successful performance of the office job of "tire adjuster" required a pleasing personality, intelligence, and an ability to get along not only with his co-workers but with the complaining customers with whom the adjuster was required to deal. It also required either the educational or job-training background which would enable him to handle paper work and mathematical computations.

By reason of the collective bargaining agreement covering his warehouse position, plaintiff had seniority, job security, contractually protected holidays and vacations, and various fringe benefits such as a health and welfare plan and pension rights. On the other hand, the tire adjuster had no seniority rights or contractually protected job security, holidays or vacations, and was not entitled to the fringe benefits provided for the warehouse employees.

As noted, plaintiff was terminated on August 2, 1971. There is no credible evidence that the stated reason for plaintiff's discharge—excessive absenteeism—was pretextual or discriminatory in its application. So, too, it is clear that the discharge was not of itself racially motivated and that a white employee would have received identical treatment under similar circumstances.

It appears that in March, 1971, plaintiff sustained a work-related injury. The effect of this injury upon plaintiff's ability to further perform the physical tasks entailed of a warehouseman is in dispute. In any event, the injury was unquestionably a major cause of plaintiff's absenteeism. In fact, plaintiff took the position in arbitration proceedings (which was decided in favor of the company) that he could not do the job for which he was employed, contending that the company should tailor a warehouseman's job for him by eliminating those duties which required manual labor.

In February, 1969, while plaintiff was still a TBA driver (but during the time he was seeking to be transferred to the position of warehouseman), the company attempted to discharge him for cause (insubordination and refusal to accept work assignments). This attempt resulted in a meeting between the union shop steward (Lawrence Davis) and company representatives, with plaintiff present, which resulted in an agreement whereby plaintiff retained his job without penalty other than a first notice of disciplinary action. A "Memorandum of Understanding," dated February 28, 1969, incorporating this agreement was signed by all parties, including plaintiff.

During the time period in which the union was aiding plaintiff to avoid a discharge, Davis suggested to defendants, at plaintiff's instance, that plaintiff be allowed to work in the warehouse on adjustment tires, work which plaintiff was then performing on occasions in addition to his truckdriving duties but which more properly pertained to the job of warehouseman.

Plaintiff himself had theretofore persistently sought a transfer to the classified job of warehouseman, and ultimately, in April, 1969, the company acceded to his request. Davis did not, however, request that plaintiff be transferred to the non-union, front office job of tire adjuster, a position in which plaintiff would have been vulnerable to being discharged without cause.

We have no doubt that what Davis had in mind (and what he communicated to defendants) was the warehouse work of inspecting adjustment tires and writing up reports relating thereto, work which constituted part of a warehouseman's (but not truck driver's) duties. However, that type of work was not a separate category covered by the union contract nor for that matter was it a full time job. And, as we have noted, the front office job of "tire adjuster" entailed the performance of a great many more responsibilities than writing up reports on adjustment tires in the warehouse, as well as requiring an ability to deal effectively with dissatisfied customers.

We find as a fact that neither plaintiff nor any one on his behalf requested that he be transferred to the front office position of tire adjuster. We do not credit plaintiff's testimony that he orally applied for the position at the time he was being reclassified to warehouseman.

In the absence of any direct evidence that the failure to transfer him to the office job of tire adjuster was racially discriminatory, plaintiff relies on circumstantial evidence such as statistics relating to the composition of the work force and what he claims is Walker Tire Company's "policy and practice" with respect to minority treatment. He also stresses the fact that the company encourages its employees to refer friends and relatives for employment and the company's limited efforts to recruit black employees and to take affirmative steps to "desegregate" the office department and the fact that of the three warehouse employees who were offered transfers to the office, only one is black. All of such evidence has been carefully considered, but in light of the evidence as a whole we find that it is unpersuasive as proof of plaintiff's claim of personal racial discrimination.

It is plaintiff's position that his discharge, which would otherwise be valid and justified, "occurred as a direct consequence and integral part of defendants' earlier discrimination in refusing to promote plaintiff [to the job of "tire adjuster"] and that "(t)he discharge is unlawful because it perpetuates the effects of plaintiff's discriminatory restriction to the warehouse position." His theory is that "the discharge is a present manifestation of the past discrimination and 'rejuvenates the past discrimination in both fact and law,'" citing *Marquez v. Ford Motor Co.*, 440 F.2d 1157, 1159–1160 (8 Cir. 1971).

Amplifying this argument, plaintiff contends that had he been promoted or transferred to the tire adjuster position he would have been precluded by the collective bargaining agreement from engaging in the type of physical activity which caused his injury. Reasoning from this premise, he argues that had he not been performing this manual labor he would not have been injured and therefore would not have been guilty of excessive absenteeism, so that the discharge for excessive absenteeism directly resulted from defendants' refusal to "promote" him.

On plaintiff's theory, it was the fortuitous fact of a job-related injury which triggered his claim of "present effects of past discrimination." No case to which plaintiff has referred us involves any comparable factual situation. Understandably, where by reason of an employer's past policies of racial or sex discrimination, an employee has not been promoted or transferred or has been prevented from acquiring seniority, the present effect of such past policies on the employee should be taken into account. The present is not such a case.

In the first place, as we have found, plaintiff never applied for the office position of tire adjuster, either by way of "promotion" or by way of transfer. In this connection, we note that the charge plaintiff filed with the Equal Employment Op-

portunity Commission on February 18, 1972, states that he has requested "that he be relieved of his manual labor tasks, and be allowed to perform the clerical duties of keeping the records for the tire adjustment department, pending recovery from his injury."

It is also clear that plaintiff was not qualified for the office position of tire adjuster and that even if that position had not already been filed in early 1969, and continuously thereafter until after plaintiff's discharge, racial considerations would have played no part in defendants retaining plaintiff in his warehouseman classification. It must not be overlooked that although plaintiff subjectively considers the "tire adjuster" job more desirable (because it does not require manual labor), a transfer to that position would not have been a "promotion" in the accepted meaning of that word. There was no line of progression from one job to the other, and certainly there would have been no job security whatever had the transfer been made. In fact, plaintiff testified that he was aware that had he been transferred to the tire adjuster position (if it became available), he would have been promptly fired in view of defendants' desire to effect his discharge which had theretofore been frustrated by provisions of the union contract.

A further and overriding reason for distinguishing the cases pertaining to present effects of past discrimination is that we find no past discrimination against plaintiff, and certainly none which prevented him from obtaining the tire adjuster position. We add that if plaintiff really believed that racial considerations prevented his transfer to the tire adjuster position, it is indeed strange that he never made a claim to defendants to that effect either in a grievance or otherwise prior to filing this action involving the validity of his discharge. If racial discrimination had allegedly been a factor in plaintiff's failure to become a "tire adjuster" a charge to that effect should have been directly and timely presented to the EEOC or litigated under Section 1981, 42 U.S.C.

We find that the weight of the credible evidence demonstrates that plaintiff is not entitled to recover under either Title VII or Section 1981.

The foregoing memorandum constitutes our findings of fact and conclusions of law. Judgment will be entered for defendants.

We have ruled plaintiff's Title VII claim on the assumption there is subject matter jurisdiction. Section 2000e–5(e), 42 U.S.C. provides that a charge must be filed within 180 days after the allegedly unlawful employment practice. Plaintiff did not file his charge within the prescribed period. His position is that inasmuch as he initiated and prosecuted a grievance under the collective bargaining agreement, the time for filing a charge with the EEOC was tolled during the pendency of the grievance procedure, citing cases such as *Culpepper v. Reynolds Metals Co.*, 421 F.2d 888 (5 Cir. 1970) and *Malone v. North American Rockwell Corp.*, 457 F.2d 779 (9 Cir. 1972).

■ What concerns us in applying this court-made extension of the statutory jurisdictional time requirement is that the grievance prosecuted by plaintiff does not charge *racial* discrimination either in discharging him or in failing to promote him. Hence, the rationale for tolling the limitation, namely that the pursuit of the grievance machinery constitutes a constructive effort to seek a private settlement of the complaint (*Culpepper v. Reynolds Metals Co.*, supra) may not be applicable to a grievance not founded on racial discrimination. This is particularly true in light of the fact that plaintiff's case is for all practical purposes based on defendants' alleged 1969 failure to promote or transfer him, matters which were never the subject of a grievance and which occurred, if at all, years before the grievance machinery was ultimately invoked.